THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE DELAWARE AND HUDSON COMPANY, Relator, *v.* PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

Third Department, May 3, 1929.

*Joseph Rosch* [*Alfred D. Kelly* of counsel], for the relator.

*William E. Fitzsimmons*, for the respondent.

VAN KIRK, P. J.   The order under review reads as follows: " That The Delaware and Hudson Company be and hereby is required to provide facilities at or near East Worcester on its Susquehanna Division, to permit the turning of locomotives now regularly engaged in the practice of proceeding from said East Worcester to Delanson in the back up or reverse direction, said turning facilities to be available for use not later than May 1, 1926, and thereafter to discontinue the practice of regularly backing up locomotives from East Worcester to Delanson."

A rehearing had been asked and denied before this proceeding was begun.   Before the order was made, and since, the Delaware and Hudson Company has used " pusher " or " helper " engines to aid freight trains up the heavy grade between Delanson and

East Worcester. These engines return, running backward, light, to Delanson, a distance of about thirty miles, over many grade crossings and through several villages. During this return trip the general speed limit is twenty miles per hour, but in specified places fifteen miles per hour. These engines are used solely in aid of trains carrying interstate commerce; the return trip is made to take the engine where it is to begin another up-grade crossing service.

The following general rules are well established: The Federal government has absolute power to control and regulate interstate commerce and its acts under that power are supreme; any State acts to control or regulate commerce, in any field within the interstate commerce tract, into which the Federal government has already entered, are inoperative; there can be no divided or rival authority after the Federal government has assumed control. (*Savage* v. *Jones*, 225 U. S. 501; *Atchison, Topeka & Santa Fe R. Co.* v. *Harold*, 241 id. 371; *Missouri Pacific R. R. Co.* v. *Stroud*, 267 id. 404, 408.) Where Congress has acted, " Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it * * * the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed." (*Southern R. Co.* v. *Railroad Commission*, 236 U. S. 439, 447; *Matter of Whish* v. *Public Service Commission*, 205 App. Div. 756; affd., 240 N. Y. 677.)

While the respondent does not dispute these rules, it seeks to distinguish the subject-matter covered by the order under review from that covered by those rules because the order is made in the interests of public safety and in the exercise of the police power of the State. We cannot approve this position. In *Oregon-Washington R. R. & Nav. Co.* v. *Washington* (270 U. S. 87) the court said (p. 101): " In the relation of the States to the regulation of interstate commerce by Congress there are two fields. There is one in which the State can not interfere at all, even in the silence of Congress. In the other (and this is the one in which the legitimate exercise of the State's police power brings it into contact with interstate commerce so as to affect that commerce), the State may exercise its police power until Congress has by affirmative legislation occupied the field by regulating interstate commerce and so necessarily has excluded State action " (citing a number of cases). In this second class are grade crossing cases (*Missouri, K. & T. R. Co.* v. *Oklahoma*, 271 U. S. 303; *Matter of Staten Island Rapid Transit R. Co.*, 220 App. Div. 80; affd., 245 N. Y. 643; *Erie R. R. Co.* v. *Public Utility Comrs.*, 254 U. S. 394); pure food cases (*Scvage* v. *Jones*, 225 U. S. 501); cases of quarantines against insect pests (*Oregon-Washington R. R. & Nav. Co.* v. *Washington*, 270 U. S. 87),

as well as others (*Missouri Pacific R. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, 620).

What then is the rule which governs in this second class of cases? *Savage* v. *Jones* (*supra*) arose concerning the sale and shipment of medical preparations in the original packages from Minnesota to Indiana; this is held to constitute interstate commerce. It is said that regulating the sales of food for domestic animals by the State law is within the police power of the State, but such law is invalid if it is in conflict with the Federal Food and Drugs Act. The subject involved related to one on which the State as well as Congress could act. The rule in this class of cases is stated as follows (p. 525): " But when the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by Congress pursuant to its constitutional authority." Does this order and its subject-matter come within this rule?

The Public Service Commission has made no findings and the only expression of intent in the order is to be found in the recitals thereof, as follows: " it appearing to the Commission that the practice of regularly backing up locomotives between East Worcester and Delanson * * * is unsafe and not reasonably necessary; and it further appearing that in order to discontinue such practice turning facilities are necessarily required at or near East Worcester, and no such facilities being present at this time, it is Ordered * * *." So that the one expressed reason for the order is that the backward movement of the engines is unsafe. The evidence does not disclose how the backing of the engine is to any appreciable extent more unsafe than its forward movement would be. The view of the engineer is interfered with when going forward by the boiler, and when going backward by the tender. Whether going backward or forward, the engineer cannot see a man on the track when he is within 100 feet of the engine; all the usual warning signals may be given when going backward as well as forward, and the headlight is the same. Each engine when running backward is attended by three men, the engineer, the fireman and a flagman. The flagman is to watch ahead; to see and report signals; he is an extra man on the engine during a backward run. There is some evidence that, when moving backward, the engineer and fireman are in awkward positions, but by turning in his seat either may avoid much of the inconvenience described and this consideration is not mentioned in the recitals in the order. The evidence does not disclose that this backward movement has occasioned

accidents. With engines moving within the speed limit of fifteen or twenty miles per hour and with a strong light on the rear and with the usual signal given, no condition of unusual danger is presented; we find no such urge for the exercise of the police power as is presented, for example, by the grade crossing cases.

What then was the purpose and intent of the order? It was made to eliminate the backward movement of the " pusher " engines. This elimination is to be accomplished by requiring the construction of some facility for turning the engines about; that is, the construction of a turntable or Y. This proposed facility is but a means of regulating the movements of these engines on the main line; thus it is a facility for use in interstate commerce and the order is a regulation of the movement of engines in interstate commerce. This, in our view, is the primary effect of the order and must be its primary purpose.

We think the Federal government has taken jurisdiction of the equipment and movement of engines in interstate commerce by the enactment of the Federal Transportation Act of 1920. It is provided in subdivision 3 of section 1 of the Interstate Commerce Act (as amd. by Transportation Act of 1920 [41 U. S. Stat. at Large, 474, 475], § 400; now U. S. Code, tit. 49, § 1, subd. 3) that " The term ' transportation ' as used in this Act shall include locomotives * * * and all instrumentalities and facilities of shipment or carriage, irrespective of ownership * * *." And subdivision 10 of section 1 of such Interstate Commerce Act (as amd. by Transportation Act of 1920 [41 U. S. Stat. at Large, 476], § 402; now U. S. Code, tit. 49, § 1, subd. 10) provides: " The term ' car service ' in this Act shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives * * * used in the transportation of property, including special types of equipment * * *." And subdivision 17 of section 1 of said Interstate Commerce Act (as amd. by Transportation Act of 1920 [41 U. S. Stat. at Large, 477], § 402; now U. S. Code, tit. 49, § 1, subd. 17) provides: " The directions of the Commission as to car service * * * may be made through and by such agents or agencies as the Commission shall designate and appoint for that purpose. * * *." In rule 129 of the Rules and Regulations of the Interstate Commerce Commission, established by order adopted pursuant to the Federal Locomotive Boiler Inspection Act (36 U. S. Stat. at Large, 913, chap. 103, as amd.; now U. S. Code, tit. 45, § 22 et seq.), is this: " (a) Locomotives used in road service. —Each locomotive used in road service between sunset and sunrise shall have a headlight which shall afford sufficient illumination to enable a person in the cab of such locomotive who possesses the usual

visual capacity required of locomotive enginemen, to see in a clear atmosphere, a dark object as large as a man of average size standing erect at a distance of at least 800 feet ahead and in front of such headlight; and such headlight must be maintained in good condition.

" (b) Each locomotive used in road service, which is regularly required to run backward for any portion of its trip, except to pick up a detached portion of its train, or in making terminal movements, shall have on its rear a headlight which shall meet the foregoing requirements."

These provisions include specific directions for the control, equipment and movement of locomotives when in road service in interstate commerce, including regularly required backward movements; this is in the field in which the order under review is to be operative. It is true there is no expressed restriction against running backward; but on the other hand there is an implied approval of such movement in that the particular light to be used in so running is provided for. That which is implied in a rule has the same force as that which is expressed. (*Savage* v. *Jones, supra.*)

We conclude, therefore, that the primary effect and purpose of this order were to regulate the movement of these engines in interstate commerce and not to further the safety of the public or the employees; and further that the order more than incidentally affects interstate commerce; it is in direct conflict with the acts of Congress and the regulations of the Interstate Commerce Commission in respect to the backward movement of the engines.

In *Oregon-Washington R. R. & Nav. Co.* v. *Washington* (*supra*, 102), after discussing the subject at length, the court concluded: " But when Congress has acted and occupied the field, as it has here, the power of the States to act is prevented or suspended." In *Savage* v. *Jones* (*supra*, 524) the court said: " The State cannot, under cover of exerting its police powers, undertake what amounts essentially to a regulation of interstate commerce, * * *."

We conclude, therefore, that the determination should be annulled, with fifty dollars costs and disbursements.

HINMAN, WHITMYER and HILL, JJ., concur; DAVIS, J., dissents, with a memorandum.

DAVIS, J. (dissenting). The power to legislate for the safety and welfare of their citizens was never surrendered by the States. Police statutes enacted to that end are valid unless arbitrary and unreasonable, or in conflict with the powers granted under the United States Constitution to the general government. (*Chicago, Rock Island & Pacific Railway Company* v. *State of Arkansas*, 219 U. S. 453; *Smith* v. *Alabama*, 124 id. 465.)

In several matters closely related to health and safety the exercise of such police powers has been held justified and railroad corporations are held subject to the law of the State in whose jurisdiction their lines are located. (*Erie R. R. Co.* v. *Public Utility Comrs.*, 254 U. S. 394; *Missouri, K. & T. R. Co.* v. *Oklahoma*, 271 id. 303; *Savage* v. *Jones*, 225 id. 501; *Chicago, etc., R. Co.* v. *Solan*, 169 id. 133; *Matter of Staten Island Rapid Transit R. Co.*, 220 App. Div. 80; affd., 245 N. Y. 643.) I think that the State has the general power to prescribe the safeguards and precautions deemed necessary to prevent wrongs and injuries to its citizens which it might redress after they had occurred.

If Congress had fully entered the field by legislation calculated to regulate not only interstate commerce but the means and instrumentalities of conducting it and providing in detail for the safety of employees and others, then existing State legislation on the same subject would be superseded, and subsequent regulations would be null. (*Southern R. Co.* v. *Railroad Commission*, 236 U. S. 439; *Oregon-Washington R. R. & Nav. Co.* v. *Washington*, 270 id. 87; *Matter of Whish* v. *Public Service Commission*, 205 App. Div. 756; affd., 240 N. Y. 677.)

It is difficult for me to discover how this local regulation of having a pusher engine run forward instead of backward, after it has completed its work, is an interference with interstate commerce. The change proposed in installing a turntable or " Y " switch involves but a slight capital outlay. (*R. R. Comm.* v. *Southern Pacific Co.*, 264 U. S. 331, 345.) The immediate duty of the pusher ceased when the top of the grade was reached. It could not greatly concern the railroad company in the next employment of this engine in interstate commerce whether it ran forward or backward on the return journey. But it may concern the State in the interest of the safety of persons traveling the highways, that those in charge of the engine may be in a position to see the many highway crossings, to give warning signals, or to take other precautions for the safety of travelers. It was established on the hearing that the opportunity of those on the engine to exercise proper vigilance was interfered with in the backward movement.

I do not understand that it is necessary for the Public Service Commission to make findings or recite the grounds of its decision in its order. It is sufficient if the record discloses reasonable grounds for its action. The purpose of the order seems clear enough. It aims to prevent possible loss of life or injury to persons and property at the highway crossings. It was determined that the method of operation was unsafe.

The Federal Transportation Act of 1920, amending the Interstate Commerce Act, and the Rules and Regulations of the Interstate Commerce Commission do not assume to regulate fully the movements of an engine such as this. It is merely provided that if it does run backward it must carry a headlight on the rear. Here there is no attempt to add to the equipment of the engine, but a regulation of its movement in the interest of public safety. I think the Public Service Commission was well within the proper exercise of its delegated police powers; and I vote to affirm the order.

Determination annulled, with fifty dollars costs and disbursements to the relator against the Public Service Commission.